IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:18-CV-117-FL

| | | |
|---|---|---|
| HEALTH & BEAUTY TECHNOLOGIES, INC.; and MEDI-BUILD INTERNATIONAL, CORP., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| MERZ PHARMA GMBH KGAA; and MERZ NORTH AMERICA, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on plaintiffs' motion to amend or alter the judgment, pursuant to Federal Rule of Civil Procedure 59(e). (DE 241). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, plaintiffs' motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiffs initiated this action on June 26, 2017, in the United States District Court for the Southern District of Florida, alleging they are owed compensation for providing defendants with certain confidential and proprietary analysis on acquisition targets in or around December 6, 2013. On March 23, 2018, the Southern District of Florida found that it lacked personal jurisdiction over defendants but transferred the case to this district pursuant to 28 U.S.C. § 1406(a).

Following transfer, the court granted plaintiffs' first motion for leave to amend their complaint. After several attempts to amend their pleading, the court allowed leave for plaintiffs

to file their second amended complaint[1] on November 28, 2018.  Plaintiffs alleged defendants are liable for breach of contract, unjust enrichment, fraud, and tortious interference with contract.

Two weeks after plaintiffs filed their complaint, defendant Merz North America, Inc. ("Merz NA") filed its motion to dismiss for failure to state a claim upon which relief can be granted, seeking dismissal of plaintiffs' complaint in its entirety.  Defendant Merz Pharma GMBH KGAA ("Merz Pharma") joined defendant Merz NA's motion.  On September 26, 2019, the court granted defendants' motion to dismiss, holding that each of plaintiffs' causes of action failed to state a claim upon which relief can be granted.[2]

After entry of judgment, plaintiffs timely filed the instant motion.  Plaintiffs do not seek to amend the allegations in their complaint, and they do not seek to revive their fraud or tortious interference with contract claims.  Plaintiffs solely ask the court to vacate its judgment to allow their breach of contract and unjust enrichment claims to proceed.

## STATEMENT OF THE FACTS

The facts alleged in the complaint may be summarized as follows.  During a conference held from September 18, 2013, to September 21, 2013, in France, Michael Polakov ("Polakov"), president of both plaintiffs in this action, met with Matthew Likens ("Likens"), then president and chief executive officer of Ulthera, regarding the possibility of Ulthera being acquired by a pharmaceutical company.  (Compl. ¶¶ 11–13).  Likens advised Polakov that although Ulthera had

---

[1]     Hereinafter, all references to the "complaint" in the text and to "Compl." in citations are to the second amended complaint filed November 28, 2018, (DE 189), unless otherwise specified.

[2]     The court also denied defendant Merz Pharma's motion to dismiss for lack of personal jurisdiction, holding that the court had specific personal jurisdiction arising from defendant Merz Pharma's contacts with North Carolina. The parties do not seek to amend or alter this portion of the court's order.

expressed interest in being acquired to several companies, no substantive discussions or active negotiations were ongoing. (Id. ¶¶ 13, 15). Thereafter, Likens and Polakov agreed at the conference that plaintiffs had a nonexclusive engagement to market Ulthera to potential acquiring companies in the pharmaceutical companies, and that plaintiffs would be entitled to a fee commensurate with a standard industry fee ranging from one to five percent of the acquisition price. (Id. ¶¶ 14, 16). Likens and Polakov shook hands to confirm their oral agreement. (Id. ¶ 17).

Prior to meeting Likens, plaintiffs had prepared and maintained extensive confidential and proprietary analysis of the medical aesthetics industry, including Ulthera, with which Polakov had maintained a relationship for nearly a decade. (Id. ¶ 18). Both before and following discussion with Likens, Polakov performed an extensive analysis of the synergies and market potential of Ulthera for prospective acquirers. (Id. ¶¶ 19, 20).

A few days after Polakov's discussion with Likens, he spoke with Jean-Yves Coste ("Coste"), the healthcare director of Michel Dyens & Co. ("Michel Dyens"), an investment banking company that represents acquirers within the healthcare and cosmetic medical field. (Id. ¶ 21). Coste indicated defendant Merz Pharma was interested in acquiring a company, and together plaintiffs and Michel Dyens agreed to provide defendants with various targets for acquisition. (Id. ¶ 22). Plaintiffs provided Coste with Polakov's detailed personal opinions, along with proprietary and confidential analysis, on several acquisition companies, including Ulthera. (Id. ¶¶ 23, 24).

On September 26, 2013, Coste sent his initial email to Hans-Jorg Bergler ("Bergler"), defendant Merz Pharma's director of corporate development, providing a profile on Ulthera and other companies. (Id. ¶ 25). Coste asked whether he would be interested in meeting with Likens.

(Id.).  In October 2013, Ulthera and defendant Merz Pharma signed a non-disclosure agreement to allow exchange of information, but no active negotiations with Ulthera occurred at any time in 2013.  (Id. ¶¶ 26, 27).  Coste engaged in further communications with Bergler and Philip Burchard ("Burchard"), defendant Merz Pharma's chief executive officer, including an October 30, 2013, email where he again discussed possible target companies such as Ulthera.  (Id. ¶ 28).  Bergler forwarded Coste's email to Michael Parrish ("Parrish"), an employee of defendant Merz NA recruited by defendant Merz Pharma to assist in acquisition efforts, and Parrish encouraged Bergler to go forward with discussing the target companies with Coste by telephone on November 8, 2013. (Id. ¶¶ 30–33).

Coste met with defendant Merz Pharma's employees by phone on November 8, 2013. (Id. ¶¶ 36–37).  At defendant Merz Pharma's request, Coste sent plaintiffs' private confidential and written material regarding Ulthera and other potential target companies that had been discussed. (Id. ¶¶ 38–39).  Bergler then arranged to have Polakov and Coste travel to defendant Merz Pharma's headquarters in Frankfurt to make a business presentation and proposal regarding acquiring companies including Ulthera.  (Id. ¶ 40).  In preparation for that meeting, Polakov prepared an extensive presentation, including previous and new information from confidential and proprietary sources on each of the acquisition targets that would be presented to defendants during the meeting.  (Id. ¶ 44).

On December 6, 2013, Polakov and Coste met with Bergler and Parrish, and Polakov provided confidential information and analysis on each of the target companies.  (Id. ¶¶ 45, 48). Defendants allegedly agreed that, in exchange for information and analysis as well as applicable merger and acquisition advisory services, plaintiffs would receive industry standard compensation

of between one to five percent of the acquisition price if defendant or any related entity purchased any of the target companies. (Id. ¶¶ 48, 57, 61). Plaintiffs allege they were promised a guaranteed one percent of the purchase price paid to acquire the target company, with the opportunity for that percentage to be enhanced up to five percent in accordance with industry standards, to be paid by defendant Merz NA or Merz Pharma or both. (Id. ¶¶ 49, 50, 60). During the meeting, Bergler and Parrish asked specific and detailed questions about each of the prospective acquisition targets and expressed concerns that Ulthera was not a good fit for defendants. (Id. ¶¶ 51, 52). In response, Polakov gave an extensive and detailed proprietary presentation about how acquiring Ulthera would be advantageous to defendants because investing in medical devices would produce significant returns. (Id. ¶¶ 54, 55). After hearing Polakov's explanation, Bergler and Parrish stated they had been educated by Polakov as to these points and would reassess their views on Ulthera. (Id. ¶ 56).

At the close of the meeting in December 2013, which Merz entity that might make the acquisition was unknown, but Bergler and Parrish acknowledged the insightful and unique points made by Polakov. (Id. ¶ 58). Plaintiffs allegedly would undertake merger and acquisition services in connection with the Merz organization to the extent that defendants or a related entity went forward with the merger. (Id. ¶ 61). Plaintiffs were to refine Polakov's analysis of the companies under discussion. (Id. ¶ 62).

On December 10, 2013, Coste sent a post-meeting email to Bergler and Parrish, recapping the meeting. (Id. ¶ 64). Polakov also sent an email to Parrish thanking him for the meeting and offering his assistance to Parrish. (Id. ¶ 65). On February 1, 2014, Burchard met with Coste at the IMCAS Medical Conference in Paris. (Id. ¶ 68). During the meeting, Burchard advised Coste

that defendants were not interested in acquiring Ulthera, would not be moving forward to acquire Ulthera, and would not be paying plaintiffs any fees pursuant to their agreement. (Id. ¶ 70). Coste informed Polakov of defendants' decision, and thereafter Polakov informed Likens that plaintiffs were unable to obtain a potential buyer. (Id. ¶ 75).

Defendant Merz Pharma never informed plaintiffs that defendants had decided to commence substantive discussions concerning a potential acquisition of Ulthera. (Id. ¶ 77). However, despite statements made by Burchard, shortly thereafter Bergler and Parrish began to negotiate with Ulthera regarding potential acquisition. (Id. ¶ 79). Defendants collaborated extensively on negotiating and structuring a deal for the acquisition and integration of Ulthera. (Id. ¶¶ 80–83). Ultimately, both Ulthera and Ultherapy, the process and procedure derived from the acquisition of Ulthera, were incorporated into defendants' business. (Id. ¶ 84).

Plaintiffs became aware of the acquisition of Ulthera by defendants for $600,000,000.00 in the summer of 2014. (Id. ¶ 85). Polakov and Coste approached Likens, who confirmed that Ulthera did not engage in serious and substantive discussions with defndants regarding acquisition until after the IMCAS Medical Conference in February 2014, a Merz entity acquired Ulthera, and Likens thought Merz was responsible for paying all fees owed to plaintiffs. (Id. ¶¶ 88, 89). Plaintiffs thereafter attempted to contact defendants to resolve the matter but were unsuccessful. (Id. ¶¶ 87, 90–97). Defendant Merz Pharma's in-house counsel claimed in an email on June 22, 2017, that defendants had commenced formal negotiations to acquire Ulthera in October 2013, and further explained that defendants had adopted a mutual nondisclosure agreement with Ulthera prior to being presented with Ulthera as a target company in September 2013. (Id. ¶ 98).

Additional facts pertinent to the instant motion will be discussed below.

# COURT'S DISCUSSION

A.      Standard of Review

"A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). A motion to amend or alter a judgment is allowed only "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 197 (4th Cir. 2006) (internal citations omitted). "Rule 59(e), in essence, gives the district court a chance to correct its own mistake if it believes one has been made." Zinkand v. Brown, 478 F.3d 634, 637 (4th Cir. 2007). "Rule 59(e) motions may not be used, however, to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." Pac. Ins. Co. v. Am. Nat. Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998).

B.      Analysis

Plaintiffs do not seek to amend their pleading, and they do not raise any intervening change in controlling law. Therefore, the court's sole concern is whether allowing plaintiffs' breach of contract and unjust enrichment claims to proceed corrects a clear error of law or prevents a manifest injustice.

1.      Breach of Contract

Plaintiffs argue that the court erred by finding no contract based on lack of mutual assent and lack of a definite price term. The court turns its attention to the latter.

Under North Carolina law,[3] the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645 (4th Cir. 2011) (quotations omitted). A contract, express or implied, requires mutual assent, mutuality of promises, and definite terms. See Horton v. Humble Oil & Refining Co., 255 N.C. 675, 679 (1961). "For an agreement to constitute a valid contract, the parties 'minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.'" Chappell v. Roth, 353 N.C. 690, 692 (2001) (quoting Boyce v. McMahan, 285 N.C. 730, 734 (1974)). "To be binding, the terms of a contract must be definite and certain or capable of being made so." Horton, 255 N.C. at 679 (quoting Williamson v. Miller, 231 N.C. 722, 728 (1950)).

Plaintiffs repeatedly alleged they were to receive one to five percent of the acquisition price of any target company acquired by defendants or their affiliates. (See Compl. ¶¶ 16, 48–50, 110, 126, 131). In one part of the complaint, defendants allegedly agreed to a "guaranteed" one percent of the acquisition price with up to five percent "based on the type and quality of the acquisition deal ultimately arranged." (Id. ¶ 48). Plaintiffs concede that any compensation exceeding one percent is void for indefiniteness. (See Pl. Mem. (DE 242) at 5). However, plaintiffs argue that the guaranteed one percent of the purchase price is severable, and thus enforceable. On this issue, the court did not commit a clear error of law.

"A contract is entire, and not severable, when by its terms, nature and purpose it contemplates and intends that each and all of its parts, material provisions, and the consideration, are common each to the other and interdependent." Mebane Lumber Co. v. Avery & Bullock Builders, Inc., 270 N.C. 337, 341 (1967) (internal quotations omitted) (quoting Wooten v. Walters,

_____

[3] Both parties rely upon North Carolina law in support of their arguments on motion to dismiss. Therefore, the court applies North Carolina law to the alleged contracts in this case.

110 N.C. 251, 254 (1892)). "Conversely, the hallmark of an installment contract is that its terms contain two or more distinct items, both in the agreement to perform and in the promise of compensation, capable of apportionment or separate allocation the one to the other, as indicated in the contract itself." Christenbury Eye Ctr., P.A. v. Medflow, Inc., 370 N.C. 1, 8 (2017) (internal quotations omitted) (quoting Neal v. Wachovia Bank & Tr., 224 N.C. 103, 107 (1944)). A contract is entire and indivisible when it "requir[es] full performance before anything is due." Steamboat Co. v. Transportation Co., 166 N.C. 582, 585 (1914).

In the instant case, the "guaranteed" one percent and the increase of up to five percent are common to each other and interdependent. Stated differently, the face of plaintiffs' complaint indicates that the "guaranteed" one percent and the increase of up to five percent are tied to the same consideration provided by plaintiffs: their confidential and proprietary analysis in support of acquiring a prospective target company in the health industry. (See Compl. ¶¶ 16, 24, 48). As the court previously put it, the complaint does not allege a series of separate deliverables to which the court can separately attribute the one percent from the up to five percent. Therefore, the price term is not divisible.

The case law cited by plaintiffs is in accord with the court's analysis. In Kornegay v. Aspen Asset Grp., LLC, the North Carolina Court of Appeals considered whether price terms were divisible where plaintiff alleged "he was supposed to receive 20% of the profits from investment projects he originated and implemented and would receive 'fair' compensation for implementing investment projects that he did not originate." 204 N.C. App. 213, 217 (2010). There, the court found that "the two promises made . . . were in exchange for two distinct return promises by plaintiff." Id. at 227. Those promises were: "(1) 20% of profits in exchange for origination and implementation of investment projects, and (2) fair treatment in exchange for implementation efforts on projects plaintiff did not originate." Id.

Plaintiffs attempt to analogize this case to <u>Kornegay</u> by arguing that the first promise was that plaintiffs would be paid one percent of the purchase price in exchange for confidential analysis. (Pl. Mem. (DE 242) at 6). Where plaintiffs' argument breaks down is the supposedly distinct second promise: that defendants agreed to pay plaintiffs up to an additional four percent for different factors including advantageous terms and purchase price. (Pl. Mem. (DE 242) at 6). Plaintiffs do not plausibly allege a separate and distinct "return promise" in exchange for this variable four percent increase.

Plaintiffs' reliance on <u>George A. Fuller Co. v. Brown</u>, 15 F.2d 672 (4th Cir. 1926) is equally unpersuasive for the same reason. In that case, plaintiff was guaranteed at least $600.00 bonus "on each of the succeeding hulls under the same conditions and in the same amounts provided the profits earned warrant the same." <u>Id.</u> at 676. As with <u>Kornegay</u>, the bonus earned was individually attributable to each ship sold. <u>See id.</u> (emphasis added) ("[T]his same definite statement was either expressly or impliedly made <u>each time a bonus was paid plaintiff on the five succeeding ships.</u>"). Plaintiffs do not plausibly allege that the price for their services can be so apportioned. Therefore, the court did not commit a clear error of law in dismissing plaintiffs' breach of contract claim.

2. Unjust Enrichment

Plaintiffs argue that the court erred by dismissing their unjust enrichment claim.

Quantum meruit, also known as unjust enrichment, "operates as an equitable remedy based upon a quasi[-]contract or a contract implied in law which provides a measure of recovery for the reasonable value of services rendered." <u>Ron Medlin Const. v. Harris</u>, 364 N.C. 577, 580 (2010) (internal quotations omitted) (quoting <u>Whitfield v. Gilchrist</u>, 348 N.C. 39, 42 (1998); <u>Potter v. Homestead Pres. Ass'n</u>, 330 N.C. 569, 578 (1992)). Plaintiffs must 1) confer a benefit on defendants, 2) the benefit must not have been conferred officiously or gratuitously, 3) the benefit

must be measurable, and 4) defendants must have consciously accepted the benefit. Booe v. Shadrick, 322 N.C. 567, 570 (1988) (citing Wells v. Foreman, 236 N.C. 351 (1952)).

A benefit is given officiously when it is "conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances." Id. "Where a person has officiously conferred a benefit upon another, the other is enriched but is not considered to be unjustly enriched. The recipient of a benefit voluntarily bestowed without solicitation or inducement is not liable for their value." Wright v. Wright, 305 N.C. 345, 350 (1982) (quoting Rhyne v. Sheppard, 224 N.C. 734, 737 (1944)).

Under North Carolina law, a measurable benefit is "the difference between the reasonable value of the services rendered and the reasonable value of the benefits received." Gales v. Smith, 251 N.C. 692, 693 (1960). Where the only issue underlying a quantum meruit claim is whether a benefit is measurable, plaintiffs "would be entitled to nominal damages at least. To recover more, plaintiff must prove the value of the services rendered." Johnson v. Sanders, 260 N.C. 291, 295 (1963); see Harrell v. W. B. Lloyd Const. Co., 300 N.C. 353, 357 (1980). Allegations of reasonable value must not be speculative. See Booe, 322 N.C. at 570–71.

On reconsideration, plaintiffs plausibly allege that at least some of the confidential and proprietary information provided to defendants was a benefit not given officiously or gratuitously, and that defendants consciously accepted that benefit. After receiving plaintiffs' confidential information, Parrish encouraged Bergler to go forward with discussing the target companies with Coste by telephone on November 8, 2013. (Compl. ¶¶ 30–33). At defendant Merz Pharma's request, Coste sent plaintiffs' private confidential and written material on potential target companies that had been discussed over the phone. (Id. ¶¶ 38–39). Bergler then arranged for Polakov and Coste to travel to defendant Merz Pharma's headquarters in Frankfurt to make a business presentation and proposal regarding acquiring companies including Ulthera. (Id. ¶¶ 40).

Finally, defendants were active participants in the presentation, soliciting information from Polakov on the various companies. (See id. ¶¶ 53–56). The fact that defendants allegedly arranged and actively engaged in the December 6, 2013, meeting allows a reasonable inference that plaintiffs were not interfering with defendants' affairs in an unjustified manner by providing confidential and proprietary information on December 6, 2013. Moreover, although the parties never agreed on an enforceable price term, supra, plaintiffs plausibly allege that the confidential and proprietary information given at the meeting was provided with expectation of compensation. (See Compl. ¶ 42).

Defendants previously argued that plaintiffs' claim should be dismissed because plaintiffs did not allege a measurable benefit. See, e.g., Lake Toxaway Cmty. Ass'n, Inc. v. RYF Enterprises, LLC, 226 N.C. App. 483, 490–91 (2013); Primerica Life Ins. Co. v. James Massengill & Sons Const. Co., 211 N.C. App. 252, 260 (2011); Progressive Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co., 184 N.C. App. 688, 697 (2007). Even assuming defendants are correct that the one to five percent figure alleged in the complaint is too speculative to state a claim for the reasonable value of plaintiffs' confidential and proprietary information,[4] plaintiffs would still be entitled to nominal damages. See Johnson, 260 N.C. at 295.

To correct a clear error of law and prevent manifest injustice in the instant action, the court vacates its judgment and allows plaintiffs' unjust enrichment claim to proceed to discovery.

## CONCLUSION

Based on the foregoing, plaintiffs' motion to amend or alter the judgment (DE 241) is GRANTED IN PART and DENIED IN PART. The court VACATES its judgment and DIRECTS the clerk to reopen this case. Plaintiffs' claim for unjust enrichment is ALLOWED to proceed to

---

[4] The court leaves for ruling on a more complete record the question of what counts as "reasonable value" for services provided by plaintiffs.

discovery.  Plaintiffs' remaining causes of action are DISMISSED.  Defendants' motion for bill of costs (DE 237) is DENIED AS MOOT.  The court's initial order on planning and scheduling will follow.

      SO ORDERED, this the 8th day of January, 2020.


                              LOUISE W. FLANAGAN
                              United States District Judge